[No. 8520.   Department Two.   March 10, 1910.]

THE STATE OF WASHINGTON, *Respondent*, v. THE CITY OF
SEATTLE *et al.*, *Appellants*.[1]

PUBLIC LANDS — UNIVERSITY LANDS — POWER TO DISPOSE OF—
REGENTS.   The acts of the territorial legislature authorizing the
board of regents of the state university to sell the old university
site at public auction under specified restrictions did not empower
the board by resolution to give the use of a strip along an alley to
the abutting owners nor to dedicate the strip for a public street.

MUNICIPAL CORPORATIONS — STREETS — PRESCRIPTIVE RIGHTS—NA-
TURE.   The prescriptive right to a public street by adverse possession
does not involve any property rights of the city in which the street
is located.

CONSTITUTIONAL LAW—VESTED RIGHTS—LIMITATIONS—REPEAL—
RIGHTS IN STREETS.   The legislature has the power, even after the
statute of limitations has run, to take away from a city the right
to plead the statute in respect to adverse possession of a city
street, as the matter is one of public concern only, and not a
property right of the city.

MUNICIPAL CORPORATIONS—STREETS—RIGHTS OF ABUTTERS—CONSTI-
TUTIONAL LAW—PROPERTY.   Owners of lots abutting on a street have
a special interest in the use of the street which is distinct from
that of the public generally and which constitutes property.

ADVERSE POSSESSION—SCHOOL LANDS—HELD IN TRUST—LIMITA-
TIONS—HIGHWAYS—PRESCRIPTION AGAINST STATE—GRANTS—EFFECT.
Under the enabling act and the constitution providing that all lands
granted to the state for educational purposes shall be held in trust
for all the people and sold or disposed of only at public auction for
the full market value, lands donated to the late territory for a
university site cannot be acquired from the state by adverse pos-
session, notwithstanding a provision that statutes of limitations
generally shall run against the state, where the donors, in subse-
quently authorizing the regents to sell the lands in the interests of
the university, and the legislature in accepting, imposed restrictions
not materially different from those of the enabling act and the con-
stitution; since the state accepted the trust and covenanted with
the donors to apply the land to certain uses only, and no title can
be' acquired by adverse possession against the state in the absence
of a provision making the state subject to the limitation.

HIGHWAYS—PRESCRIPTIVE USE—ESSENTIALS.   Rem. & Bal. Code,
§ 5657, declaring public highways that have been used for seven years

[1]Reported in 107 Pac. 827.

to be lawful roads, where the same have been kept up at public expense, is only a statute of limitations, and has no application where the road has not been kept up at public expense.

Appeal from a judgment of the superior court for King county, Main, J., entered July 14, 1909, upon findings in favor of the plaintiff, after a trial on the merits. Affirmed.

*Scott Calhoun, Bruce C. Shorts, Leander T. Turner,* and *Sandford C. Rose,* for appellants, contended, among other things, that public highways can be established by adverse use. *State v. Horlacher,* 16 Wash. 325, 47 Pac. 748; *Smith v. Mitchell,* 21 Wash. 536, 58 Pac. 667, 75 Am. St. 858. Vested rights are acquired when the statute of limitations has run. 25 Cyc. 988; 8 Cyc. 922, 1012; *Seattle v. De Wolfe,* 17 Wash. 349, 49 Pac. 553; *Packscher v. Fuller,* 6 Wash. 534, 33 Pac. 875; *Grigsby v. Peak,* 57 Tex. 142; *State v. Aberdeen,* 34 Wash. 61, 74 Pac. 1022. Public lands may be acquired by prescription and acquiescence. *Board of Comr's of Greene County v. Huff,* 91 Ind. 333; *Dimon v. People,* 17 Ill. 416; 22 Am. & Eng. Ency. Law (2d ed.), p. 1189; *City of Laredo v. Martin,* 52 Tex. 548; *Nichols v. Boston,* 98 Mass. 39, 93 Am. Dec. 132; *Piper v. Richardson,* 9 Met. 155; *Attorney General v. Revere Copper Co.,* 152 Mass. 444, 25 N. E. 605, 9 L. R. A. 510. The 34-foot strip has become a street by estoppel, which applies against the state. *United States v. Stinson,* 125 Fed. 907; *Northern Pac. R. Co. v. Ely,* 25 Wash. 384, 65 Pac. 555, 87 Am. St. 766, 54 L. R. A. 526; *Forster v. Raznik,* 46 Wash. 692, 91 Pac. 252. Property devoted to one public use may be claimed for another public use by prescription or estoppel. *Prudden v. Lindsley,* 29 N. J. Eq. 615; *Board of Com'rs of Greene County v. Huff, supra.*

*The Attorney General, M. M. Lyter,* and *Douglas, Lane & Douglas,* for respondent, contended, *inter alia,* that the statute of limitations cannot run against the state where the state has no power of alienation as to the specific property,

regardless of the fact that the statute purports to run against the state. 1 Cyc. 1113; *Ralston v. Weston*, 46 W. Va. 541, 76 Am. St. 834; *Sollers v. Sollers*, 77 Md. 148, 26 Atl. 188, 39 Am. St. 404, 20 L. R. A. 94. The state having no power to make the grant, the presumption of a grant is not raised by prescription. *Donahue v. State*, 112 N. Y. 142, 19 N. E. 419, 2 L. R. A. 576; *Norrell v. Augusta R. & Elec. Co.*, 116 Ga. 313, 42 S. E. 466, 59 L. R. A. 101; *Simplot v. Chicago etc. R. Co.*, 16 Fed. 350. Lands dedicated to a particular public use, the state holding as a trustee for the people and in its sovereign capacity as a proprietor, cannot be acquired by adverse possession, regardless of the fact that the statute of limitations applies to the state as well as individuals. *West Seattle v. West Seattle Land and Imp. Co.*, 38 Wash. 359, 80 Pac. 549; *Hoadley v. San Francisco*, 50 Cal. 265; *Yolo County v. Barney*, 79 Cal. 375, 21 Pac. 833, 12 Am. St. 152; *Board of Education of San Francisco v. Martin*, 92 Cal. 209, 28 Pac. 799; *City and County of San Francisco v. Straut*, 84 Cal. 124, 24 Pac. 814; See, also, *Bolster v. Ithaca St. R. Co.*, 79 App. Div. 239, 79 N. Y. Supp. 597; *Phipps v. State*, 7 Blackf. (Ind.) 512.

PARKER, J.—This is a suit to quiet title, prosecuted by the attorney general in behalf of the state against a large number of defendants. A decree was rendered in favor of the state. The defendants City of Seattle, Lippy, and Crawford have appealed.

The land involved in this appeal consists of a strip of land 34 feet wide extending from Seneca to Union Streets, and lying immediately on the west of the alley between 5th and 6th avenues, in the city of Seattle. The state claims title to the land under a deed granting to the territory of Washington a ten-acre tract of land as a site for the territorial university, which grant includes this strip. The city claims the strip has become a part of a public street con-

sisting of the alley and the strip, in all fifty feet wide. The other appellants claim special interest, as a property right, in having the street maintained at the full width of the fifty feet, because they are the owners of lots abutting upon the easterly side of the alley.

The principal reliance of appellants, in support of their contention that the land in question is part of a public street, is upon the ground that it has become such by prescription. There is room for argument as to whether or not the evidence shows such a use of the strip as to make it a part of a public highway by prescription, if that contention was being made against the rights of private parties instead of the state. We think, however, that there are undisputed facts, shown by the record, sufficient to determine the rights of the parties independently of that question. These facts relate to the history and nature of the title acquired by the state in the land, and are as follows: In December, 1860, the territorial legislature passed an act (Laws of 1860-61, p. 4) providing as follows:

"Section 1. Be it enacted by the Legislative Assembly of Washington Territory, That the Territorial University be, and the same is hereby located and established at Seattle, in King county: Provided, a good and sufficient deed to ten acres of land, eligibly situated in the vicinity of Seattle, be first executed to the Territory of Washington for University purposes."

Later at the same session, in January, 1861, an act was passed (Laws 1860-61, p. 17) providing, among other things, as follows:

"Sec. 1. Be it enacted by the Legislative Assembly of the Territory of Washington, That Daniel Bagley, John Webster and Edmund Carr be, and they are hereby constituted and appointed a board of commissioners to select, locate and receive a title for ten acres of land within the vicinity of Seattle, that may be donated to the Territory of Washington for a site for the Territorial University. . . ."

Thereafter Arthur Denny and others deeded to the terri-

tory a ten-acre tract of land including the strip here in-
volved, to be used as a site for the university. These deeds
refer to the legislative provisions locating the university at
Seattle, and contain recitals clearly evidencing an intent to
restrict the use of the ten acres to that of a site for the uni-
versity. Thereafter the university was established upon the
tract, and it was enclosed by a fence following the outer
lines of the tract. At a meeting of the regents of the uni-
versity, held on August 1, 1873, action was taken by them
and recorded in the journal of their proceedings as follows:

"Ordered that on petition of the residents adjoining the
east and west sides of the University grounds, that they be
authorized to appropriate so much of the University grounds
as may be necessary to make a street fifty feet wide on each
side, inclusive of alleys, provided that said residents shall
erect a good substantial fence on the grounds, as good at
least as the one first erected, within five months next en-
suing."

Soon thereafter, the residents and persons at whose in-
stance this action was taken moved the fence on the easterly
line, back upon the university grounds 34 feet, and recon-
structed it there to the satisfaction of the regents. This,
it is claimed by appellants, marked the beginning of the use
of the strip which has converted it into a public street by
prescription. Early in 1891 it was contemplated moving the
university to its present location, and to the end that the
restriction upon the alienation of the original site might
be removed, and that it might be disposed of for the benefit of
the university, the original donors of the part of the land
here involved, executed a deed to the state containing con-
ditions and restrictions as follows:

"This grant is upon the following conditions to be kept
and performed by second party. Second party shall cause
to be duly passed by its State Legislature and approved by
its Governor, proper enactments authorizing said second
party by its proper officers to purchase or otherwise procure
the fee to sufficient lands within six miles of the present so-

called University site in said City of Seattle; said lands to be forever used exclusively for a State University purposes and shall be in a compact body of not less than 100 acres in extent:

"That said enactments shall further authorize second party to contract for the sale of the lands comprising the present so-called University site in said City of Seattle of which the aforesaid described lands are a part and parcel at such time as the said second party shall have procured by its proper officers other lands for the State University purposes. That said enactments shall authorize the sale of the lands hereinbefore described in such parcels and for such prices as may be most advantageous to the interests of the said State University. . . .

"Further provided that all the proceeds of the sale or sales of the lands constituting the present so-called University site in said City of Seattle shall be used—

"1st, for the purchase of other lands for a State University purposes as hereinabove provided.

"2nd, for the erection of necessary and suitable buildings thereon for a State University purposes and the improvement of said lands.

"3rd, the balance to be invested in such manner as the State Legislature may prescribe, the interest arising therefrom to be used in the support and maintenance of said University. Provided, however, that the principal may be used in the erection of additional University Buildings on said lands. That said enactments shall also provide that sufficient of the present so-called University site in said City of Seattle shall continue to be used for a State University purposes until such time as other suitable buildings are erected upon the lands to be procured under the terms and conditions of this Grant and said Legislative enactments.

"This deed shall become operative according to its terms and conditions at such time as second party shall cause enactments to be passed and approved as aforesaid, authorizing the fulfillment of the terms and conditions of this instrument."

Thereafter, by the Laws of 1891, p. 229, and the Laws of 1893, p. 293, the legislature accepted this deed, and provided for the establishing of the university at its present lo-

cation.   By section seven (Laws of 1893, p. 297), it is, among other things, provided:

"The board of regents may, by decision of six-eighths of their number, duly ascertained by aye and nay vote, which shall be recorded in their minutes, proceed to sell the ten acres in the city of Seattle known as the 'university grounds,' which have been deeded to the state by A. A. Denny and others, which deeds are hereby accepted and made a part of this act.   Such sale shall be made at public auction only, and the said board of regents may sell the whole of said tract of ten acres or it may cause same to be subdivided into lots and blocks, with streets and alleys conforming to the plan of the said city adjoining.   No part of the said ten acre tract shall be sold until 'the value thereof, less the improvement, shall be appraised' by three appraisers, one to be appointed by the governor, one by the mayor of Seattle, and one by the board of regents, who shall be paid a reasonable compensation for their services out of the university fund.   No public auction shall be held and no sale of any part of the said ten acres shall be made until after the board of regents has given notice of the time, place and terms of the sale, by publication for four successive weeks in one daily paper at Spokane, one in Walla Walla, one in Olympia, one in Port Townsend, one in Whatcom, one in Tacoma and one in Seattle."

We have reviewed the history of the acquisition of this land by the territory and state, together with the legislation touching its management and disposition, in order that we may have before us the exact nature and purpose of the grant, and the terms upon which the territory and state accepted it.

Whether the action of the regents in 1873 be considered as an attempt to give the use of this strip to the adjoining owners, as the terms of the resolution seem to imply, or as an attempted dedication of a public street, it is clear that, under the law as then existing, the regents had no power to do either.   Learned counsel for appellant do not seriously contend to the contrary, but argue that the action of the regents

characterized the use, which it is claimed then commenced and continued, for sufficient time to constitute the strip a part of a public highway by prescription. The question then, in any event, is one of prescription and adverse use only; the resolution of the regents and the action of the residents thereunder being only material as a circumstance tending to show the commencement of such use. We will not attempt to answer the somewhat uncertain question of fact as to the extent of the use of this strip as a part of a public street, but will attempt to answer the inquiry, Can the state be divested of its title and right to the use of this land for the purpose it was granted, by prescription or adverse possession?

From 1854 to 1903 our law limiting the time for the commencement of actions, including actions to recover real property, provided that such limitation should "apply to actions brought in the name of the state . . . or for its benefit, in the same manner as to actions by private parties." Ballinger's Code, § 4807; Abbott, Real Property Statutes, pp. 130-137.

In 1903 (Laws of 1903, p. 26; Rem. & Bal. Code, § 167), the legislature amended § 4807 of Bal. Code, so as to read as follows:

"The limitations prescribed in this act (chapter) shall apply to actions brought in the name or for the benefit of any county or other municipality or *quasi* municipality of the state, in the same manner as to actions brought by private parties: *Provided,* That there shall be no limitation to actions brought in the name or for the benefit of the state, and no claim of right predicated upon the lapse of time shall ever be asserted against the state: *And further provided,* That no previously existing statute of limitation shall be interposed as a defense to any action brought in the name of or for the benefit of the state, although such statute may have run and become fully operative as a defense prior to the adoption of this act, nor shall any cause of action against the state be predicated upon such a statute. An action shall be deemed commenced when the complaint is filed."

39—57 WASH.

For the purpose of avoiding the effect of this amendment upon the rights of appellants, it is contended that the statute had run its course prior to 1893, and therefore the rights of the appellants having become vested, the change in the application of the statute of limitations to the state could not revive a cause of action in behalf of the state by which appellants could be divested of such rights. It may be conceded that whatever the effect of such change may be upon remedial rights only, it cannot have any effect upon property rights which have been acquired by prescription or adverse possession under the statute before the change. 25 Cyc. 988; Wood, Limitations (3d ed.), §.14; Cooley, Constitutional Limitations (7th ed.), 521.

So far as the appellant city of Seattle is concerned, its property rights are not here involved. It is the right and duty of the city to represent the public whenever it is sought by litigation to recover land within the bounds of what it claims to be a public street within the city, whether such claim be based upon prescription or dedication; but this is true because the statutory law of the state places in the city authorities the management and control of streets within the city, and not by reason of any property right existing in the city. Clearly the legislature has the power to take away from a municipality the right to plead the statutes of limitations whether the statute has run its full course or not, if the matter involved is only of public concern and does not involve any property right of the city. Whether or not the city could thus be divested of property rights acquired by adverse possession against the state prior to the change of the statute we need not determine.

In the case of *State v. Aberdeen*, 34 Wash. 61, 74 Pac. 1022, this court held that the amendment to § 4807 took away from the city the right to plead the statute of limitations, though the statute had run its course before the passage of the amendment. That was an action by the state to recover from the city the state's portion of liquor license fees

collected by the city to which the right of the state would have
been barred had not the amendment of § 4807 removed the
bar.   The decision was based upon the principle that the
legislature may compel municipalities to pay debts or claims
not strictly binding in law, but which are just and equitable
in their character and involve a moral obligation.   The
power of the city here involved being equally within the con-
trol of the legislature, we see no reason for holding that the
right of the city to invoke the statute may not be limited by
the legislature, even by an act passed after the statute has
fully run and barred the right of the city but for its change
or repeal.

In dealing with the rights of the other appellants, we are
confronted with claims which are, in effect, property rights.
These appellants base their claims upon the fact that they
are owners of property abutting upon the street of which it is
claimed the strip of land in controversy has become a part.
The rights of such owners are different from the rights of
the public generally in the street.   Such rights are referred
to in Elliott on Roads and Streets (2d ed.), p. 961, as fol-
lows:

"It is substantially agreed by the courts that the abutter
has a private interest in the road or street as such, and if
he has this right it is property which cannot be taken from
him without compensation.   The right to a road or street
which the landowner possesses as one of the public is dif-
ferent from that which vests in him as an adjoining proprie-
tor, and it is also distinct and different from his rights as
owner of the servient estate.   The right which an abutter
enjoys as one of the public and in common with other citizens
is not property in such a sense as to entitle him to compen-
sation on the discontinuance of the road or street; but with
respect to the right which he has in the highway as a means
of enjoying the free and convenient use of his abutting
property it is radically different, for this right is a special
one.   If this special right is of value—and it is of value
if it increases the worth of his abutting premises,—then it
is property, no matter whether it be of great or small value."

Now the rights . of these private parties have been acquired, if at all, by the use of the street adverse to that contemplated in the grant of this land and its acceptance by the territory and state; and while the rights claimed are not technically rights claimed to have been acquired by their own adverse possession, yet, since they are property rights claimed to have been acquired by use adverse to the state and by lapse of time, we think the question must be determined by the law of adverse possession. And this brings us to the question, Did the statute of limitations, prior to the amendment of § 4807 in 1903, run against the state so that it could be divested of its title by adverse possession, in view of the purpose for which this land was acquired and held?

It is elementary that "In the absence of a provision making the state subject to the statute of limitations no title by adverse possession can be acquired against the state." 1 Cyc. 1112; 2 Enc. L. & P. 555; Wood, Limitations (3d ed.), § 52. Several decisions of this court have been rendered showing that the statute of limitations as it existed prior to 1903 did not, under all circumstances, run against the state though its provisions then existing might seem to so indicate.

In the case of *West Seattle v. West Seattle Land and Imp. Co.,* 38 Wash. 359, 80 Pac. 549, the defendant was claiming land by adverse possession which had been dedicated as a public street, and it was held that land so dedicated could not be acquired by adverse possession. At page 363, the court said: "The general rule is that a party cannot acquire title by adverse possession to property held by a municipality in its governmental capacity for public purposes." While this decision was rendered after the amendment of § 4807, it was, nevertheless, dealing with a right which was claimed to have become vested by ten-year possession prior to that amendment. In the case of *Brace & Hergert Mill Co. v. State,* 49 Wash. 326, 95 Pac. 278, it was held, that the state's title to the bed and shore land to navigable waters

could not be divested by adverse possession. This decision, however, was rested upon legislation which the court considered rendered all possession of such lands prior to sale by the state merely permissive, and hence such possession would not be construed as adverse to the state. In the case of *O'Brien v. Wilson,* 51 Wash. 52, 97 Pac. 1115, the court held that the state's title to its school lands granted by the government upon its admission to the Union was not subject to be lost by adverse possession, notwithstanding the general statute of limitations applied to the state. This decision was based upon certain provisions in the grant and certain provisions in the state constitution accepting the grant, which restricted the manner of the sale and disposition of the land and the use of the funds to be derived therefrom. By section 11 of the act for the admission of Washington to the Union, it is provided, "That all lands herein granted for educational purposes shall be disposed of only at public sale, and at a price not less than ten dollars per acre, the proceeds to constitute a permanent school fund, the interest of which only shall be expended in the support of said schools." 25 Stats. at Large, 676. And by sections 1 and 2 of article 16, of the state constitution accepting the grant, it is provided:

"Sec. 1. All the public lands granted to the state are held in trust for all the people, and none of such lands, nor any estate or interest therein, shall ever be disposed of unless the full market value of the estate or interests disposed of, to be ascertained in such manner as may be provided by law, be paid or safely secured to the state; nor shall any lands which the state holds by grant from the United States (in any case in which the manner of disposal and minimum price are so prescribed) be disposed of except in the manner and for at least the price prescribed in the grant thereof, without the consent of the United States.

"Sec. 2. None of the lands granted to the state for educational purposes shall be sold otherwise than at public auction to the highest bidder; and the value thereof, less the improvements, shall, before any sale, be appraised by a board of appraisers, to be provided by law, the terms of payment

also to be prescribed by law, and no sale shall be valid unless the sum bid be equal to the appraised value of said land. In estimating the value of such lands for disposal, the value of improvements thereon shall be excluded."

A comparison of these provisions with those of the grant and acceptance thereof, here involved, we think will show no very material difference. The substance of the reason of the court's decision in that case can be found in the quotation therein of the language used by the supreme court of Minnesota, in the case of *Murtaugh v. Chicago etc. R. Co.*, 102 Minn. 52, 112 N. W. 860, 120 Am. St. 609 as follows:

"The state accepted the trust, and by its constitution solemnly covenanted with the United States to apply the granted lands to the sole use of its schools according to the purpose of the grant, and prohibited the sale of any portion of the granted land except at public sale. Such being the nature of the title of the state to its school lands, it is unthinkable that the legislature intended, by section 12, c. 66, G. S. 1866, and later acts amending it, to provide a way whereby the trust as to any of the school lands might be defeated, and title thereto acquired by adverse possession, contrary to the mandate of the constitution that title thereto could only be obtained by a public sale thereof."

Notwithstanding the decision in *O'Brien v. Wilson*, involved a grant of land from the United States for the benefit of the common schools, and an acceptance of that grant by constitutional provisions, it seems to us the principle there involved is applicable to this case. When the territory of Washington, in 1861, accepted the grant of this land to be used as a site for its university, and when thereafter, in 1891 and 1893, the state, by legislative enactment, accepted from the donor the deed removing the restrictions upon alienation of the tract, but with conditions therein to the effect that the state should by legislative enactment, authorize the sale of the land in such parcels and for such prices as may be most advantageous to the interest of the state university, and the further condition that the funds derived from such sale

should be devoted to the upbuilding and maintenance of the university, it accepted the trust and solemnly covenanted with the donors to apply the granted land to the sole use of the upbuilding of its university, according to the purpose and spirit of the grant, no less than when it accepted the grant from the government; and while the restrictions touching the manner of sale are not therein enumerated and prescribed with quite so much detail as in the government grant, the obligations thereby imposed upon the state, we think, are no less binding than as if the grant had come from the government instead of an individual, and the promise to abide by the spirit of the grant had been evidenced by constitutional instead of statutory enactments. It may be conceded that a grant of land in support of the common schools, such as the government grant is, is of somewhat more importance than a grant for the upbuilding and maintenance of a state university, but one is no less the property of the people than the other. We are of the opinion that the general statute of limitations, while in force against the state, did not have the effect of enabling property rights to be acquired, by adverse use or possession, in land held by the state for such public purpose as this land was acquired and held.

Some reliance is placed by counsel for appellants upon the case of *Peterson v. Baker*, 39 Wash. 275, 81 Pac. 681, and also *Smith v. Mitchell*, 21 Wash. 536, 58 Pac. 667, 75 Am. St. 858, where it was held that a public highway may be acquired by prescription over school lands granted by the government. But those decisions rest upon the provisions of the act of Congress expressly granting right of way for public highways over public lands.

Appellants also seek to maintain their rights under § 5657 of Rem. & Bal. Code, providing as follows:

"All public roads and highways in this state that have been used as such for a period of not less than seven years, and are now so used, where the same have been worked and kept up at the expense of the public, are hereby declared to

be lawful roads and highways within the meaning and intent of the laws now existing governing public roads and highways in this state."

This is only a statute of limitation, and in view of what has been said, the contention hardly needs further answer. However, it will be noticed that, in order to constitute a highway under this section, something more than mere use by the public is necessary. The road must have been worked and kept up at public expense; otherwise the section has no application. *Seattle v. Smithers*, 37 Wash. 119, 79 Pac. 615. A reading of the evidence in this case convinces us that, whatever may be here shown as to the use of this strip by the public, it is clear that there has been no such work or improvement put upon this land at the expense of the public as to bring it within the provisions of § 5657.

By § 7 of the act of 1893, above quoted, it will be noticed that the regents, as incident to their power to sell, may cause the land, "to be subdivided into lots and blocks, with streets and alleys conforming to the plan of the said city adjoining." We deem it not out of place to state that the evidence in this case shows that the dedication of this strip as a part of a public street would not conform to the plan of the city of Seattle surrounding this tract. The alley 16 feet wide, to which it is sought to add this strip, does conform, and had for years prior to the giving of the power of dedication to the regents conformed, to the plan of the city adjoining.

We are of the opinion that the judgment of the superior court should be affirmed. It is so ordered.

DUNBAR, CROW, and MOUNT, JJ., concur.