[No. 30395. Department One. June 1, 1948.]

KING COUNTY et al., Appellants, v. W. H. HAGEN et al., Respondents.[1]

[1] Reported in 194 P. (2d) 357.

*Lloyd Shorett, L. C. Brodbeck, John W. Croome,* and *Robert D. Yeomans,* for appellants.

*Skeel, McKelvy, Henke, Evenson & Uhlmann, W. Paul Uhlmann,* and *Altha P. Curry,* for respondents.

HILL, J.—This is an appeal from a judgment denying appellant King county's request (supplemented by that of numerous interveners who are also appellants) for an injunction against the placing of obstructions by respondents on and across what is alleged to be a public road, thereby preventing access to what is known as Franklin dock. The

basic question involved is the right of the public to have access by land to a dock on Lake Washington located at the foot of Walthew avenue (also known as Seventy-eighth avenue southeast), extended.

Walthew avenue, as we will call it because it is generally so referred to in the testimony, appears as a dedicated street in a replat of Island Park filed July 31, 1906, but it did not and could not extend as such beyond the south line of government lot 2, section 13, township 24 north, range 4 east, W. M., which was the south line of the platters' property. To reach the dock in question, Walthew avenue would have to be extended southwesterly beyond the south line of government lot 2 a distance of sixty feet, measured along the center line of such an extension. This would be across a portion of tract 15 of Harry White's Plot of East Seattle, as shown by the plat thereof recorded on January 2, 1889, and the shorelands of the second class adjacent thereto, now owned by the respondents. The north line of tract 15 is the north line of government lot 3, section 13, township 24 north, range 4 east, W. M., which is, of course, coincident with the south line of government lot 2.

■ Any title which the public may have acquired to travel this extension of Walthew avenue must rest upon prescriptive rights and not upon any grant or dedication. The argument that the extension of Walthew avenue is a dedicated road must rest on the contention that the then existing shore line of Lake Washington, rather than the meander line (which was about ninety-five feet out in the lake, measured along the line between government lots 2 and 3), was the westerly boundary line of government lots 2 and 3 before the lake was lowered. There is no basis for such a contention. The patent to government lot 3 antedated statehood, and, as the government meander line was farther out than the shore line, the former and not the latter was the westerly boundary line of government lot 3 and of that portion thereof owned by the respondents. *Bleakley v. Lake Washington Mill Co.*, 65 Wash. 215, 118 Pac. 5, and cases there cited.

Walthew avenue, as platted, reached the lake shore more than thirty feet before it reached the south line of government lot 2, if the distance be measured along its center line. It was only after the lake was lowered, in 1913, uncovering a ninety-five foot strip between the original shore line and the present shore line, measured along the center line of Walthew avenue extended, that it became necessary to cross that part of government lot 3 and the adjacent shore-lands then belonging to predecessors in interest of the respondents in order to reach the lake.

It seems that Walthew avenue, which had originally been an old logging road, was the natural route for one Lucas, who had a farm "up on the hill," to reach the lake. He originally kept a rowboat at the foot of Walthew avenue and used it to transport his produce destined for the Seattle market. Later he built what one witness called a catwalk, leading to a dock some three or four feet above the water where his scow or barge could land. This scow was driven by a gasoline engine, and he could put his horse and buggy or wagon on it and transport them across the lake. Mr. Lucas was drowned in 1907, and for a time after his death, others were afraid to use the dock; as his son testified, "The dock was not safe for the boat to land, because it was made for the scow."

We find no substantial evidence of any public use of the Lucas or Franklin dock, as we shall hereafter call it, until about 1911, when, as the "movies" would say, "Came the Dawn." The Dawn in this instance was a small steamer which picked up passengers at various docks on Mercer Island and took them to Roanoke, also on the island, where they could take the ferry which ran between that point and Seattle. At that time, 1911, King county did some work on the dock and constructed a float which, as the lake was lowered, could follow the receding water level. When the lake reached its present level, a new dock was constructed. Just when the present dock was built is not clear. A county record says 1916; witnesses fixed the date by the lowering of the lake, in 1913, and respondents' witness Walter A. Dearborn testified that the present dock was there in 1915.

Whatever the date of its construction, it is clear that the lake reached its present level in 1913, and that, at all times since 1913, it has been necessary to travel over the extension of Walthew avenue to reach either the present dock or the dock and float which antedated the present structure. This extension is approximately sixty feet in length and is across a portion of government lot 3 and the second-class shorelands adjacent thereto belonging to respondents and their predecessors in interest.

While this was not an automobile ferry dock, automobiles could be and were from time to time driven onto it. The witness Alex Voulas testified to having gone down to the dock regularly with his horse and wagon during the period from 1913 to 1923, to get feed and hay which had been unloaded thereon. There was also evidence that some people who used the dock left their cars parked all day near it.

There was nothing in the evidence to indicate that, from the time the county built the float in 1911 and the lake was lowered in 1913, anyone who used the dock and the extension of Walthew avenue leading to it had any idea that the use was permissive. It was used as any other portion of Walthew avenue was used, and there was no way of telling where Walthew avenue as dedicated ended and Walthew avenue as extended over the property of the respondents began. It was a use that was open and notorious, and clearly the members of the public using this road considered that they had a right to do so. There was no evidence that the right of the public to use this portion of Walthew avenue was ever challenged or questioned until July 13, 1926, when the King county commissioners recognized that A. C. Girard, a predecessor in interest of the respondents, was the owner of the land occupied by the dock, and leased from him

"... those certain premises in section 13, township 24, North Range 4, East W. M., together with the shore lands of the second class in front of, abutting upon and adjacent thereto, which said land lies within the marginal lines produced into the waters of Lake Washington of Walthew Avenue in the Plat of Island Park, an addition to King County ...,"

for the term of one year, for a consideration of ten dollars. Two subsequent leases were executed, one dated July 31, 1928, for one year, and one dated October 15, 1929, for three years. The consideration in the latter was one hundred fifty dollars. Before the lease last referred to had expired, the respondents had acquired the property.

The dock continued to be used for transportation purposes until the bridge between Mercer Island and Seattle was completed in 1940 and the Dawn came no more. Subsequent to 1940, the extension of Walthew avenue has been used mostly by fishermen and swimmers as a means of access to the dock. The respondents have assumed, since the cessation of the use of the dock for public transportation purposes, that they have the right to prohibit the use of this extension of Walthew avenue by the public, and they have requested people whom they regarded as objectionable to leave the premises. Actual obstruction of the approach by the respondents did not occur until the spring of 1946, and this action was brought to enjoin the obstruction.

■ If King county or the public acquired any right to the area included within the extension of Walthew avenue heretofore referred to, it was subsequent to 1911, when King county built the float, or 1913, when the lowering of the lake was completed, and prior to July 13, 1926, when King county recognized the rights of respondents' predecessors in interest to the area in question by paying rental therefor. Prior to 1911, the use of the dock apparently was limited to the Lucas family; all of the area in question was under water until the lake was lowered; and, unless prescriptive rights had been acquired prior to July 13, 1926, the further use of the property could not be said to be adverse. It is clear, however, that if the public or King county had acquired any prescriptive title or right prior to July 13, 1926, recognition of Girard's rights by the leases referred to did not divest the public (or King county) of any rights it may have acquired. In *McInnis v. Day Lbr. Co.*, 102 Wash. 38, 172 Pac. 844, we said that,

". . . having arrived at the conclusion that its prescriptive rights, to the extent recognized by the trial court,

were perfected in the year 1910, it would seem to be of no consequence what negotiations, amounting to less than the formal conveyance by respondent of its thus acquired prescriptive right, were had in 1910 and later. It seems to be well settled law that:

" 'Where title has become perfect by adverse possession for the statutory period it is not lost by an admission by the holder that the possession was not adverse.' 2 C. J. 256.

"We find a clear statement of the rule announced by Chief Justice Reese, speaking for the supreme court of Nebraska in *Towles v. Hamilton,* 94 Neb. 588, 143 N.W. 935, as follows:

" 'It is elementary that, where the title has become fully vested by disseizin so long continued as to bar an action, it cannot be divested by parol abandonment or relinquishment or by verbal declarations of the disseizor, nor by any other act short of what would be required in a case where his title was by deed.' "

And again, more recently, in *Northwest Cities Gas Co. v. Western Fuel Co.,* 13 Wn. (2d) 75, 123 P. (2d) 771, we said:

"A prescriptive right, once acquired, cannot be terminated or abridged at the will of the owner of the servient estate, nor even by the oral admission of the easement claimant that his use was not, and is not, adverse. 28 C. J. S. 716, Easements, § 52; *McInnis v. Day Lbr. Co.,* 102 Wash. 38, 172 Pac. 844; *Downie v. Renton,* 162 Wash. 181, 298 Pac. 454, reversed, on rehearing, on other grounds, 167 Wash. 374, 9 P. (2d) 379."

Nor would the fact that the dock has not been used for public transportation purposes since 1940 and that it is now used only for recreational purposes such as swimming and fishing, effect any abandonment of the rights of the public to the road leading thereto. It was open to such use as the public chose to make of it until the respondents placed the obstructions on it which this action seeks to enjoin. See *Foster v. Bullock,* 184 Wash. 254, 50 P. (2d) 892.

The crucial question then becomes the character of the use of the extension of Walthew avenue from the time of the lowering of the lake until 1926. It seems to us that from the time the uplands and shorelands over which the extension of Walthew avenue is located were uncovered by

the receding waters of Lake Washington, the public use was open, notorious, and under the same claim of right as that to the dedicated portion of Walthew avenue. Such use by the public was certainly an "unfurling of its flag," to use an oft-quoted expression (see *Skoog v. Seymour*, 29 Wn. (2d) 355, 187 P. (2d) 304), and was a challenge to the predecessors in interest of the respondents to take steps to protect their rights therein.

■■ The open, notorious use by the public of this extension of Walthew avenue for more than the statutory period of ten years raises the presumption that the public use was adverse and places the burden on the respondents to rebut the presumption by showing that the use was permissive. *Northwest Cities Gas Co. v. Western Fuel Co., supra,* and cases there cited. This the respondents seek to do by taking the position that the land was wild, uncultivated, and unenclosed. That it was uncultivated and unenclosed we will agree, but not that it was wild as that term is used in the cases holding that the use of wild, uncultivated, and unenclosed land for roads or rights of way will be presumed to be permissive. The upland property was platted; settlers were relatively numerous in the vicinity; and the owners of the property involved in this proceeding were living, for at least part of each year, within a few hundred feet thereof. The property itself is an extension of a dedicated street to its terminus at a dock, and from physical appearances no one could tell where the dedicated street ended and the extension thereof began. The *rationale* of the rule in the cases cited by respondents in support of their position is that travel over wild and unoccupied land is not notice to an absent owner, and that such use by others is not adverse to the true owner's interest. It is clearly applicable to the facts in *State ex rel. Shorett v. Blue Ridge Club*, 22 Wn. (2d) 487, 156 P. (2d) 667, and similar cases, but has no applicability to the present situation.

■ Respondents argue that, since their predecessors in interest also used the extension of Walthew avenue and the dock,

" . . . this element of common use is an indication that it is not hostile. There is no evidence of inconvenience to the landowner, nor of interference with his use of the property. This fact is evidence in itself that the use was exercised in subordination to the property owner's title."

We cannot follow respondents' argument on that point. It seems to us that respondents mistake the connotation of the word "hostile" as used in cases of this character. It does not imply enmity or ill will; it is entirely consistent with friendly relationships between users of the roadway and owners of the land over which it runs. It does, however, imply a use inconsistent with the right to exclusive use by the owners of the land. *Roesch v. Gerst,* 18 Wn. (2d) 294, 138 P. (2d) 846. A somewhat similar situation presented itself in *Hamp v. Pend Oreille County,* 102 Wash. 184, 172 Pac. 869, L. R. A. 1918E, 400, where a trail across land belonging to the Hamps had been widened to eight feet, not only with their consent but with their assistance. However, the use thereof was held to be adverse. The court said:

"It is plain from the evidence that the use of the trail during all these years has been open and adverse to the rights of all owners of land across which it runs."

The case of *Mason County v. McReavy,* 84 Wash. 9, 145 Pac. 993, has some points of similarity. That was an action to compel the removal of an obstruction from one of the streets appearing on the plat of Union City on Hood's Canal, which had been filed in 1889. The street was actually on tidelands to which the platters had no title. The court said:

"Subsequently, in the year 1901, the tide lands of the townsite were acquired by the defendant from the state. Since that time it is shown, practically without dispute, that a portion of this street called Canal street has been used by the public as a thoroughfare. Conceding, however, that the original plat of the street was invalid by reason of the fact that the plattors did not own the fee to the land, it was afterwards used as such street more than ten years, the same as it had been previously used. It is true that no public money had been expended upon the street by the county authorities. But this court has held that, in order to constitute a public highway, it is not necessary that public money

should be used thereon, provided it has been used by the public as a road or street for a period of more than ten years."

We hold that not only had the public acquired a prescriptive right to the use of the extension of Walthew avenue by its open, notorious, and adverse use thereof for a period of more than ten years between 1913 and 1926, but also that, during the same period, the extension of Walthew avenue had become a public road and highway within the purview of § 1 of "An Act correcting informalities of record in the establishment of the various public roads and highways in this State," approved March 6, 1890, and carried into Rem. Rev. Stat. as § 6494 [P.P.C. § 616-1]:

"All public roads and highways in this state that have been used as such for a period of not less than seven years, and are now so used, where the same have been worked and kept up at the expense of the public, are hereby declared to be lawful roads and highways within the meaning and intent of the laws now existing governing public roads and highways in this state."

This act was repealed in 1937, and Rem. Rev. Stat., Vol. 7A, § 6450-10 [P.P.C. § 608-3], was substituted therefor, and it, in turn, was amended in 1945.

Contrary to the contention of the respondents and the conclusion of the trial court, we have held that prescriptive rights could be acquired under the statute quoted. In *Stofferan v. Okanogan County*, 76 Wash. 265, 136 Pac. 484, we said:

"In this state, however, we have repeatedly held that roads may be established by prescription by the use by the public for a period of not less than seven years, where the same have been worked and kept up at the expense of the public, as provided in Rem. & Bal. Code, § 5657 (P. C. 441 § 91); or where not so kept up at the public expense, simply by continued use by the public for a period co-extensive with the period of limitation for quieting title to land, which is, in this state, ten years. *Seattle v. Smithers*, 37 Wash. 119, 79 Pac. 615; *Okanogan County v. Cheetham, supra* [37 Wash. 682, 80 Pac. 262, 70 L. R. A. 1027]; *State v. Horlacher*, 16 Wash. 325, 47 Pac. 748; *Smith v. Mitchell*, 21 Wash. 536, 58 Pac. 667, 75 Am. St. 858. . . .

"It is plain that, under the authority of the foregoing decisions, a public highway in this state may be just as effectually established by prescription as by order of the county commissioners on petition."

(Rem. & Bal. Code, § 5657, referred to in the quotation, is identical with the statute above set forth.)

See, also, *Mason County v. McReavy, supra,* and *Roediger v. Cullen,* 26 Wn. (2d) 690, 175 P. (2d) 669, which cite and quote the *Stofferan* case.

In *Seattle v. Smithers,* 37 Wash. 119, 79 Pac. 615, the court said:

"The lower court was evidently of the opinion that, before a road could become a public highway by prescription, public work or money must have been expended thereon, under the provisions of Bal. Code, § 3846, because a finding was made to the effect that no work has been done on the road at public expense. But this statute does not apply to roads which have been used adversely for a period of time sufficient to constitute a road by prescription without public expense thereon. It applies to cases only where public work and money have been expended. In such cases seven years' user is made sufficient. In other cases the prescriptive period is co-extensive with the period of limitation for quieting title to the lands. *Wasmund v. Harm, supra* [36 Wash. 170, 78 Pac. 777]. The purpose of this statute was evidently to lessen the prescriptive period, when public work and money had been expended. It does not affect the rule in cases where no public work has been done. This being the effect of the statute, it follows that the findings of the trial court show a public highway by prescription."

(Bal. Code, § 3846, referred to in the quotation, is identical with the statute above set forth.)

It is true that we said, *obiter dictum,* in *State v. Seattle,* 57 Wash. 602, 107 Pac. 827, 27 L. R. A. (N.S.) 1188, that the statute referred to was "only a statute of limitation"; but we based the inapplicability of the statute to the situation there presented on the fact that

". . . there has been no such work or improvement put upon this land at the expense of the public as to bring it within the provisions of § 5657 [referring to Rem. & Bal. Code, § 5657]."

If we concede that it is "only a statute of limitation," it must be recognized that the periods of adverse possession on which prescriptive rights are based follow, by analogy, the applicable statutes of limitation. *Wasmund v. Harm,* 36 Wash. 170, 78 Pac. 777; *Mason v. Yearwood,* 58 Wash. 276, 108 Pac. 608, 30 L. R. A. (N.S.) 1158; *Northwest Cities Gas Co. v. Western Fuel Co., supra.*

The evidence established that the extension of Walthew avenue had been used as a public road and highway for a period of not less than seven years prior to July 13, 1926, and had been worked and kept up at the expense of the public during that period. (In fact, it is clear that it was maintained by the county at least from the completion of the present dock until that dock ceased to be used for public transportation purposes in 1940.)

The public had, by July 13, 1926, acquired a prescriptive right to travel over the extension of Walthew avenue to the Franklin dock, which it is conceded is owned by King county, regardless of whether the prescriptive period is a ten-year period coextensive with the period of limitation for quieting title to land, or the seven-year period referred to in the act of March 6, 1890, which is applicable when the road has been worked and kept up at the expense of the public. As has been heretofore pointed out, nothing occurred on July 13, 1926, or subsequent thereto, which has divested the public of the rights it had then acquired.

The judgment is reversed, with instructions to the trial court to enter an order enjoining respondents' obstruction of or interference with the use of the extension of Walthew avenue to the Franklin dock. Appellant King county will recover its costs on this appeal.

MALLERY, C. J., MILLARD, and SCHWELLENBACH, JJ., concur.

SIMPSON, J., dissents.