[No. 22624.    Department Two.    April 21, 1931.]

R. B. DOWNIE, *Appellant*, v. THE CITY OF RENTON, *Respondent*.[1]

[1]Reported in 298 Pac. 454.

182

*Shorett, Shorett & Taylor,* for appellant.

*Agnes N. Richmond* and *Hyland, Elvidge & Alvord,* for respondent.

MILLARD, J.—This action was brought to enjoin the city of Renton from discharging waste water from its reservoir on to the plaintiff's land. Plaintiff, being unable to sustain the same, voluntarily dismissed his second cause of action to recover for loss of fish and damage to his fish pond by such drainage. As an affirmative defense, the city alleged that it had acquired by prescription the right to flow water from its reservoir over the plaintiff's land. The trial of the cause to the court resulted in judgment of dismissal. Plaintiff has appealed.

In 1921, the appellant purchased, and has ever since owned and resided upon, three lots (comprising approximately two acres) lying to the south of the city of Renton and adjacent to the county road. A small, steady stream of pure water, fed from springs, runs through a gulch across this property from the southwest. In 1928, the appellant constructed upon this property, near the north boundary thereof, a concrete dam ninety feet long and eighteen feet high at the center. This created a pond covering approximately fifteen thousand square feet (a little more than one-sixth of the area of the two-acre tract of appellant), the water averaging ten to twelve feet in depth. The same year

this dam was constructed, the appellant purchased twenty-five thousand small fish at a cost of one hundred and twenty-five dollars, and placed them in this pond. The appellant also maintained at this dam a wheel, which, except for the summer months, generated his electricity.

Since 1908, the city of Renton has maintained a reservoir as a part of its municipal water system. This reservoir is located adjacent to the said county road, and about twelve hundred feet to the south of appellant's two acres. It is of concrete, and has a capacity of five hundred thousand gallons. A pipe line ten inches in diameter leads from the bottom of the reservoir and runs a distance of about six hundred feet in an easterly direction, emptying into a natural depression or gulch, then empties into a small stream, which is the identical stream mentioned as flowing across the property of the appellant. This pipe line is used for draining the reservoir.

It has been the practice since construction of the reservoir in 1908 to semi-annually discharge the water through the city service pipes until the water level in the reservoir is three or four feet from the bottom, when the remainder is drained through the ten-inch drainage or wash-out pipe, the amount of water so discharged through the drainage pipe being about forty thousand gallons. Because of the contamination by the presence of the bacillus coli in the city water, algae on the side walls of the reservoir, and sediment in the tank, the water is drained off as above mentioned, the sediment removed by men with buckets, and, after the flushing out of the tank through the drainage pipe, the inside of the tank is whitewashed. The silt or dirt, brushed down from the sides and in the bottom of the reservoir, is carried in buckets over the top of the reservoir and deposited on to the respond-

ent city's own property, and does not pass through the wash-out line. This process of draining occupies from two to two and one-half hours, the water so discharged reaching the property of appellant by gravity flow from the outlet of the drainage pipe.

The testimony of respondent's witnesses was to the effect that the water discharged from the reservoir through the wash-out line at no time reached to the top of the wall of appellant's dam. Appellant testified that the sudden emptying of the water into the fish pond from the reservoir raised its level above the top of the dam, resulting in the fish being washed over the top of the dam and being killed. Appellant testified that his property was flooded three times: In May, 1928, a short time prior to placing the fish in the pond, and twice in September, 1929.

"Q. You want to say there were three times, once in May, 1928—A. On the 21st of May, 1928. Q. Yes. A. Just as soon as the wall was built and the dam was full of water, they washed the reservoir out. Q. And then again you say that the city flushed its reservoir in September? A. Yes, twice. Q. Twice? Tell the court those two dates in September, 1929, upon which you claim they flushed the reservoir? A. I can't tell you. It was in September."

By letter of September 25, 1928, the clerk of the city of Renton advised counsel for appellant that the city was making plans to fix this reservoir so that no water would come down into appellant's fish pond; that the city was planning to divert the water to another location.

On September 10, 1929, respondent's water superintendent advised appellant by letter as follows:

". . . The water department of the city of Renton is about to connect its new supply main with its reservoir on Talbot Hill. In order to do this it will be necessary to completely empty said reservoir and the

water that is released will pass through your pond and over the spillway of your dam. While the reservoir is empty we will also clean and repair it. We will not release the water in such quantity as will cause you any damage, but will let it out gradually. We will probably begin to empty on September 12th and it will remain empty for three or four days.

"Will you please cooperate with us to the extent that you lower your spillway gate to accommodate the excess water that will pass through?"

No water was drained from the reservoir at that time, as a temporary injunction was issued on application of the appellant on September 11, 1929, restraining the respondent from discharging water from the reservoir. From that date until the injunction was dissolved on September 20, 1929, no effort was made to drain the reservoir. As soon as the injunction was dissolved, the water was discharged from the reservoir. Appellant testified that, at the particular time in September when the water came from the reservoir into the creek and down into his pond, he did not raise the bolt which lowers the spillway of the dam; that the wire at his house by which he always did raise the spillway was in some manner defective, and that he could not go over to the pond to raise the bolt. He testified:

"Yes, I tried to raise it from the house and I could not. I am lame and I could not, and I had to go over to the pond, to the wall before I could raise the bolt. Q. If you could have raised it would that have prevented the overflow? A. From the house? Q. Yes. A. I suppose it would. Q. How is that operated, that bolt, Mr. Downie? How do you raise it? A. With a wire. Q. And what was the reason you could not raise it at that time from the house? Is that the customary place you do that? A. No, only to get my lights. When I want to give the wheel water, then I pull the bolt at the house, and up comes the light. . . . Q. And that particular day you didn't succeed in doing that?

A. No. Q. Why? A. The bolt was stuck. It hadn't been used for a long time.''

■ Appellant contends that the discharge of contaminated water semi-annually from the respondent's reservoir into the gulch, and thence into his fish pond, constitutes a violation of substantial rights in the use and enjoyment of property, entitling him to injunctive relief, though the resultant monetary damages suffered from such nuisance cannot be proved.

In *Mitchell Realty Co. v. City of West Allis,* 184 Wis. 352, 199 N. W. 390, 35 A. L. R. 396, it was held that a municipal corporation is liable for injury to lower riparian owners for turning into a stream large quantities of water from its water works system and from artesian wells grossly charged with impurities, although it employs the natural course of drainage in so doing. Though the damages caused by flowing waters upon the lands of another be not considerable, equity will enjoin the continuance of such nuisance.

''The corporation is liable . . . if, without authority of law, it collects surface or other waters in a public sewer, and empties them upon the land of an individual to his injury, either immediately or by force of gravitation.'' Gould on Waters (3rd ed.), p. 530, § 261.

''If any nuisance of this kind be shown, though causing inconsiderable damages, equity will enjoin its continuance . . . The inconvenience is one of the public's own creation, and should be borne by it rather than the individual.'' Id., p. 813, § 546.

■ Respondent insists that, having carried on this practice for at least twenty years, a prescriptive right has been acquired by it to dispose of the water from the reservoir in the manner herein set forth.

A prescriptive right acquired by one is determinative of a corresponding loss or forfeiture of right by another, and, as forfeitures are not favored, it is

absolutely essential that all of the elements necessary to constitute a permanent valid claim by adverse user, amounting to a prescriptive right should be shown to be present.

"There are certain essential elements which enter into their composition, and which must be present before a right can be acquired by prescription. And as a prescriptive right, acquired by one person, is a corresponding loss or forefeiture of right by another, and, further, as the law does not favor forfeitures, it is absolutely essential that all the elements prescribed by law as necessary to constitute a permanent valid claim by adverse possession amounting to prescriptive right should be present." 2 Kinney on Irrigation and Water Rights (2d ed.), p. 1876, § 1048.

That is to say, the respondent has no prescriptive easement, unless, for ten consecutive years, the drainage semi-annually of the reservoir and the resulting flowage of appellant's land were so open, notorious, and adverse to the interests of the appellant (and his predecessors in interest) that he was bound to take notice of that invasion and object to the continuance thereof, or become bound by the servitude this imposed upon his land. To acquire an easement by prescription the owner must know of and acquiesce in the adverse claim, or the use must be so open, notorious, visible, and uninterrupted that knowledge and acquiescence will be presumed. 9 R. C. L. 779; 19 C. J. 881.

A right to flow water over another's land may be acquired by prescription. *Crumbaugh v. Mobile & O. R. Co.*, 105 Miss. 485, 62 South. 233.

"Drainage rights may be acquired by prescription. The character of the usage of an easement which will ripen into a legal right by prescription is the same as is required to gain title to land by adverse possession. . . . The claim of right must be exercised with the knowledge of the owner of the servient estate, i. e., actual knowledge or a user on the part of the claimant

of such character that knowledge will be presumed.''
*Naporra v. Weckwerth,* 178 Minn. 203, 226 N. W. 569.

■ The case at bar is not one within the rule of claim of right by adverse possession to uncultivated, unoccupied, and wild lands. *Murray v. Bousquet,* 154 Wash. 42, 280 Pac. 935. The land through which the water from the reservoir flows is close to and in view of the county road. One of appellant's neighbors testified that he uses part of this water which is carried across his land for his barn, and he has lived there since 1913. The area of appellant's three lots is approximately two acres or eighty-seven thousand square feet. More than one-sixth of that area has been converted into a fish pond. His neighbor knew as early as 1913, and others testified they knew as far back as 1909, that the reservoir was drained semi-annually and the water discharged into the gulch, thence into the stream flowing across appellant's land.

That the use was open and notorious is clear. Appellant has resided on the two acres since 1921. He did not complain until 1928 of the use of the gulch and creek by the respondent for drainage of its reservoir. Surely, on such a small tract of land, on which he resided for seven years, the appellant could not fail to see, the presumption is conclusive that he did see, the water flowing through the gulch fourteen to sixteen times during that period.

We do not agree with appellant that the semi-annual discharge of the water into the gulch was not such open, notorious, and continuous use as the law requires must be done in order to serve as a basis for an adverse claim of right. We are convinced that appellant had actual knowledge sometime subsequent to 1921, and prior to the construction of his dam in 1928, of respondent's use of the ditch. If such discharge of the water into that ditch resulted as appellant contends,

of depositing a substantial amount of silt and dirt, the accumulation from 1908 to 1921, plus the added deposit subsequent to 1921, the gradual filling in of the gulch, apprised appellant of the use by respondent.

The first complaint made of the water flowing over his land was made by the appellant to the respondent in August, 1928. Appellant testified that the city wrote and informed his counsel they would not route any more water over the pond; that no more water was thrown upon his land until the date he got the restraining order. It is clear from the testimony, however, that the appellant is mistaken. Doubtless the appellant is somewhat confused as to his dates. It is clear from the record that in September, 1929, when appellant was advised that the reservoir would be cleaned, and request was made that he lower the spillway of his dam, an order was issued, on application of the appellant, restraining the city from discharging the water into the gulch; that no water was discharged from the reservoir into the gulch until the temporary restraining order was dissolved September 20, 1929.

The use by respondent of the ditch was such as afforded reasonable indication of the claim. To constitute a prescriptive right to use of the ditch for flowage of waste water from the reservoir, the acts of respondent must have been of such a nature and frequency as to give notice to appellant that the right was being claimed.

"It has been said that the correct rule, as to continuity of use to give a prescriptive right to an easement and what shall constitute such continuity, can be stated only with reference to the nature and character of the right claimed. However, in order that user may be considered continuous, it is not necessary that it should be constant. Ordinarily, if whenever the claimant needs it from time to time he makes use of it, and the acts constituting the user are of such frequency as

to give notice to the landowner of the rights claimed against him, the user will be considered continuous. And a fortiori a temporary nonuser by agreement of the parties is not fatal. Nevertheless there must be such repeated acts of such character and at such intervals as afford a sufficient indication to the owner that an easement is claimed; . . . '' 19 C. J. 882.

See, also,

''By *exclusive,* the law does not mean that the right of way must be used by one person only, because two or more persons may be entitled to the use of the same way, but simply that the right should not depend for its enjoyment upon a similar right in others, and that the party claiming it exercises it under some claim existing in his favor independent of all others. It must be *exclusive* as against the right of the community at large.

''Nor does the law mean by *'an uninterrupted and continuous enjoyment,'* that a person shall use the way every day for twenty years, but simply that he exercises the right more or less frequently, according to the nature of the use to which its enjoyment may be applied, and without objection on the part of the owner of the land, and under such circumstances as excludes the presumption of a voluntary abandonment on the part of the person claiming it.'' *Cox v. Forrest,* 60 Md. 74.

''The claimant is required to make such reasonable use of the way as his needs require. So it is of the ditch. If, whenever the claimant needs it, from time to time, he makes use of it, this is a continuous use. An omission to use when not needed does not disprove a continuity of use, shown by using it when needed (*Bodfish v. Bodfish,* 105 Mass. 317). Neither such intermission nor omission breaks the continuity.'' *Hesperia Land & Water Co. v. Rogers,* 83 Cal. 10, 23 Pac. 196.

Prior to September, 1929, there was no affirmative act on the part of appellant contesting the right of respondent to use the ditch for the drainage of its

reservoir. Prior to appellant's moving upon the property in 1921, the prescriptive right of respondent to so use the ditch had been acquired. (For more than ten years prior to 1921, the ditch was continuously used by respondent.)

A letter from the city clerk in the year 1928, advising counsel for appellant of the city's plan to divert the water to another location, and the letter of respondent of September, 1929, requesting cooperation on the part of appellant to prevent the flooding of his pond, are not such acts on the part of respondent as will defeat its prescriptive right. The respondent's title had vested prior to that time; therefore, conceding respondent requested permission in 1929 to flow the land, such act would not have defeated the prescriptive right of the respondent. The rule is stated as follows:

"It is elementary that where the title has become fully vested by disseizin so long continued as to bar an action, it can not be divested by parol abandonment or relinquishment or by verbal declarations of the disseizor, nor by any other act short of what would be required in a case where his title was by deed. *School District v. Benson,* 31 Me. 381. We therefore conclude that from any point of view, whether a lease was made or not is not a material matter." *Towles v. Hamilton,* 94 Neb. 588, 143 N. W. 935.

"The presumption of a grant is rebutted if the person prescribing for the easement acknowledges the right of the owner within twenty years, though he does it under a mistake of his own rights. So the asking leave to exercise the right from time to time within the period of prescription breaks the continuity of the enjoyment as of right, inasmuch as each asking of leave is an admission that, at that time, the person so asking had no title; but the right, when fully established by adverse use, is not lost by asking and receiving a license from the original owner, although this may, in case of doubt, be strong evidence that the previous user

was not under a claim of right." Gould on Waters (3d ed.), p. 641, § 339.

"Where title has become perfect by adverse possession for the statutory period it is not lost by an admission of the holder that the possession was not adverse, . . ." 2 C. J. 256.

See, also, *McInnis v. Day Lumber Co.*, 102 Wash. 38, 172 Pac. 844.

The appellant had actual knowledge shortly subsequent to 1921 of the use by respondent of the ditch, and did nothing to prevent respondent from its continuous enjoyment of the right claimed by it. The use by the respondent of that ditch has been open, notorious, continuous, uninterrupted, and adverse to the appellant and his predecessors in interest since 1908.

The judgment is affirmed.

MITCHELL, HOLCOMB, and FULLERTON, JJ., concur.

BEALS, J., dissents.