[No. 22624. *En Banc.* March 24, 1932.]

R. B. DOWNIE, *Appellant,* v. THE CITY OF RENTON, *Respondent.*[1]

[1]Reported in 9 P. (2d) 372.

*Shorett, Shorett & Taylor,* for appellant.

*Agnes N. Richmond* and *Hyland, Elvidge & Alvord,* for respondent.

ON REHEARING.*

BEELER, J.—The single question to be determined is whether the city of Renton acquired a right by prescription to discharge refuse water from its reservoir onto and across the lands of the appellant. The trial court found that the city had acquired such right, and denied the appellant injunctive relief, and entered a decree dismissing his action, from which he prosecutes this appeal.

The facts are not in serious dispute. But since we have reached a conclusion different from that of the trial court, a detailed statement of the facts is deemed essential.

In 1908, the respondent constructed a concrete reservoir, of a capacity of 500,000 gallons, approximately one mile south of its corporate limits, to be used in conjunction with its municipal water system. Two water mains, one ten inches and the other fourteen inches in diameter, are attached within a few feet of the base of the reservoir for the purpose of bringing water to the city to be used for domestic purposes; while a waste pipe ten inches in diameter is attached to its base and used to discharge the refuse water at such times as the reservoir is scrubbed, cleaned and washed out.

The waste pipe extends in an easterly direction a distance of six hundred feet and discharges the water into a natural gully. By force of gravity the water then flows eastward some four hundred fifty feet and

* N. B. For former Departmental decision, see Id., 162 Wash. 181, 298 Pac. 454.—REP.

runs into a natural gulch, through which a small stream of pure water, fed by springs, flows in a northwesterly direction and crosses the appellant's land. The waste water, after entering the gulch, likewise flows in a northwesterly direction. The distance from the point where it enters the gulch to the point where the gulch enters the appellant's land is approximately one thousand feet.

The appellant purchased his tract of land in 1921, and has continuously resided thereon. The tract is slightly in excess of two acres, and is 190 feet wide at its northerly boundary, 270 feet wide at its southerly boundary, and extends north and south a distance of about 485 feet. The gulch crosses it lengthwise. The westerly boundary of the tract skirts along a county road. At the time of purchase, the land was unused, unimproved, unoccupied, unfenced, and covered with underbrush and second growth trees.

In 1928, he constructed a concrete dam near the northerly boundary of the tract. This dam is approximately eighteen feet high at its center, and extends across the entire width of the gulch (approximately ninety feet), thereby creating an artificial pond of about one-third of an acre or fifteen thousand square feet in extent, which was stocked with twenty-five thousand fish. The difference in elevation between the base of the reservoir and the pond is approximately 110 feet.

From 1908 to 1929, at such times as the water became contaminated and unfit for human consumption by reason of the presence of bacillus coli, and the adherence of algae on the side walls, and the accumulation of sediment on the floor of the tank, the city would scrub and clean the reservoir. This was done usually once a year. The water would be drained to within three or four feet of the bottom of the tank

through the service pipes, the side walls washed and scrubbed, the sediment carried away in buckets, and the waste or contaminated water, some thirty-five or forty thousand gallons, drained through the waste pipe and discharged onto and across the appellant's land. Ordinarily, this would require from two to two and a half hours.

During September, 1929, after the respondent had scrubbed and washed down the side walls, the waste or contaminated water was drained and discharged into the appellant's pond, and as a result a great deal of debris, muck and mud was washed or flushed into the pond, making the water very muddy and dirty so that it had the appearance of being "soupy."

■ Prescriptive rights are not favored by the law.

"And as a prescriptive right, acquired by one person, is a corresponding loss or forfeiture of right by another, and, further, as the law does not favor forfeitures, it is absolutely essential that all of the elements prescribed by law as necessary to constitute a permanent valid claim by adverse possession amounting to prescriptive right should be present." 2 Kinney on Irrigation and Water Rights, p. 1876.

Under the statute, a right by prescription may be acquired within ten years. Hence, if the respondent acquired a prescriptive right to discharge the refuse water from its reservoir into the gulch and thence onto and across the appellant's lands, such right was acquired during the period when the land was owned by his immediate grantor, that is, between 1908 and 1921. But throughout that entire period, the appellant's grantor did not reside upon the land. From 1908 to 1921, the land was unused, unoccupied, unimproved, and unfenced, and substantially in a wild state covered with second growth trees and underbrush. The undisputed evidence shows that appellant's

grantor had no actual knowledge of the adverse user by the city.

To acquire an easement by prescription, the owner must know of, and acquiesce in, the adverse user, or the use must be so open, notorious, visible and uninterrupted that knowledge and acquiescence will be presumed.

"All the authorities agree that, in order to bar the true owner of land from recovering it from an occupant in adverse possession and claiming ownership through the operation of the statute of limitations, the possession must have been, for the whole period prescribed by the statute, actual, open, visible, notorious, continuous and hostile to the true owner's title and to the world at large." 1 R. C. L. 686.

"No prescriptive right to the use of water can be claimed as against one who had no knowledge or notice of the claim or of the fact that his rights were being invaded; but notice is presumed where the works or operations of the adverse claimant are matter of common notoriety or so conspicuous that they would not escape the attention of an ordinarily vigilant man." 40 Cyc. 698.

■ ■ The burden of proving the existence of a prescriptive right is placed upon the one who is benefited thereby. *Skansi v. Novak,* 84 Wash. 39, 146 Pac. 160; *People's Savings Bank v. Bufford,* 90 Wash. 204, 155 Pac. 1068.

The inquiry, then, is whether the asserted adverse user by the city was of a sufficiently open, notorious and hostile character to charge the appellant's predecessor in interest with presumptive knowledge or constructive notice of the isolated acts of user. The word "notorious" is defined by Webster as "generally known and talked about by the public; usually believed to be true; manifest to the world; evident."

" 'Notorious' in the sense here used, has been defined by this court to mean 'generally known and talked

of; universally recognized; conspicuous; well, widely, or commonly known.' " *Spicer v. Spicer,* 249 Mo. 582, 155 S. W. 832, Ann. Cas. 1914D 238.

"The words 'open and notorious possession,' as applied to the adverse holding of land by another, mean that the disseisor's claim of ownership must be evidenced by such acts and conduct as are sufficient to put a man of ordinary prudence on notice of the fact that the land in question is held by the claimant as his own. . . . It is, therefore, essential in all cases that the owner shall have notice to that effect. If he has actual notice that will, of course, be sufficient in itself. Where, however, there has been no actual notice, it is necessary to show that the possession of his disseisor was so open, notorious, and visible, as to warrant the inference that the owner must, or should, have known it; otherwise a mere trespass might be evidence of ouster." 1 R. C. L. 700.

As we have heretofore observed, the property from 1908 to 1921 was unfenced, unused, and unimproved, a wild stretch of acreage almost as nature left it. Neither the appellant's vendor nor the appellant himself, when he became the purchaser, could have discovered, by passing over the land, any indication of adverse user, and the acts of user relied upon by the respondent were of such a nature as to negative the very idea of presumptive notice.

It is quite clear from the record that the first actual notice the appellant obtained that the city was discharging the waste water from this reservoir into the gulch was in May, 1928, soon after the dam was completed. The following August, he complained and remonstrated with the city, and insisted that it cease from further continuing to so divert its refuse water. Nor was there anything about the manner in which the reservoir was cleaned or drained that would in any wise bring knowledge to his attention. This took but from two to two and one-half hours, and occurred, ac-

cording to the most reliable testimony in the record, only once a year between 1908 and 1929.

The entire operation of the draining of the reservoir during that period was under the control of Dr. Dixon, the city's health officer, and the day and hour when it was to take place were fixed by him. He testified: *"Once a year we drained the reservoir into this ditch."* He further testified:

"We drain it once a year, because the reservoir becomes contaminated. The last summer before that we found some bacillus coli germs. This is contrary to the state department of health, and we either had to chlorinate our water or drain it."

He further testified:

"It has been the habit to drain the reservoir down to about four feet through the mains as they are today. From there on we run it through the trap at the bottom. The reason is this: It is an open reservoir, and there is algae collects on the side walls and sediment on the sides of the tank. That has to be washed, and then we whitewash. That has been the way for twenty years.

"This material, I think would contaminate the mains, and I don't think it would be safe to do so, because every time we took samples we have found it contained germs, and I think it would be deleterious to health. That is the reason we have the tap in the bottom of the tank."

On cross-examination, he testified:

"These mains are rough inside, and there is danger of material in there for some time afterwards and then getting loose and getting into the water. And the water itself is contaminated by the men working in the tank, and the pipe gets thick with slimy material that is from the reservoir. There is a lot of that material."

Respondent's testimony, excepting that of the witness Harris, who owns a two-acre tract contiguous to and situated on two sides of the reservoir, was that the

reservoir had been cleaned once a year. Harris testified: "I know the reservoir was drained once or twice a year." But whether the reservoir was cleaned annually or semi-annually is immaterial. In either event, nothing short of eternal viligance on the part of appellant's predecessor, who did not reside on the tract, would have served to bring to him knowledge of this surreptitious invasion of his property rights.

The law imposes no such duty on the owner of property. This is well illustrated by the celebrated case of *Liverpool Corporation v. H. Coghill & Son*, 1 Law Rep. Ch. Div. (1918), p. 307. There it was held that, where the discharge of polluted water was intermittent and usually made at night and in a manner that neither the landlord nor the tenant had actual notice thereof, the claim to do so by prescription must fall. The justice who pronounced the opinion, said:

"If, then, the methods adopted by the defendants could in any circumstances have been made the foundation of a prescriptive right, a point upon which I express no opinion, I am satisfied that in the circumstances here disclosed the enjoyment has not been of such a character as to establish any such right. It has throughout been secret, not surreptitious or actively concealed from, but unknown to and unsuspected by the plaintiffs and their predecessors, and incapable, therefore, of being relied upon as the foundation of rights to their prejudice."

In cases like this, the nature of the property is of controlling importance when considering whether the user was open, notorious and hostile. The evidence clearly indicates that, at the time the appellant acquired the land, there were "thousands of small trees" growing thereon, including the area embraced within the gulch. In addition to the second growth trees, the slopes were covered with underbrush. The center of the gulch was eighteen feet deep at the dam. Hence,

it would appear that the bottom of the gulch was concealed from ordinary view. Under all the circumstances, it is quite obvious that the adverse user was not open, visible or notorious, as those terms are used in the law.

■ In addition to having open, notorious and hostile possession, it is also essential that such possession, in order to ripen into a prescriptive right, be shown to have been continuous and uninterrupted for the full statutory period.

"Continuity is the very essence of the doctrine and policy of the statute of limitations. It has been said that if there be one element more distinctly material than another in conferring title by adverse possession, where all requisites are so, it is the existence of a continuous adverse possession. . . . Hence occasional trespasses or acts of ownership do not constitute such continuous possession as will ripen into a title by adverse possession, although extending over the statutory period." 2 C. J. 82.

"To found a prescriptive water right on adverse possession the enjoyment of it must have been continuous during the necessary period of time, and not merely temporary or occasional, and there must have been an actual use and enjoyment of the water or the right, although it is not necessary that such use should be daily or that the same quantity should be used every year or throughout the year." 40 Cyc. 696.

A different rule applies where the user, as here, consists of occasional acts of trespass, and cases where water is appropriated during long periods of time and the amount appropriated varies according to the seasons. In the latter class of cases, the law seems to be that, if the claimant makes use of the water from time to time as his needs require, there is a continuity of use. A stricter rule applies where the prescriptive right is based upon occasional torts spread over the statutory period. In the latter class of cases, the rule

is quite general that isolated cases of trespass, though repeated over a long period of time, do not constitute use so as to support a claim of prescriptive right. *Elyton Land Co. v. Denny,* 108 Ala. 553, 18 South. 561; *Pierce v. Travers,* 97 Mass. 306. In the former case, the court said:

"There is no proof that during that time, the occupation of appellants and those from whom they claim was open, notorious, uninterrupted and continuous. The proofs fail to show that there was any person in the occupation of the premises or any part of it, claiming title thereto, in hostility to the owner, from 1870 to 1887 or 1888. There were occasional acts tending to show possession, such as cutting wood by Brown, in 1880; running street lines in 1870 or 1871; surveying it into streets and blocks in 1882; grading a dummy line in 1884, and laying the track in 1886, but all such acts were disconnected, were not continuous, and of brief duration."

The same thought is expressed by the supreme court of Massachusetts in the *Pierce* case, *supra:*

"The occasional use of flash-boards in the summer for short periods as an exception to the general rule not to keep them up during that part of the year, does not amount to the open, uninterrupted and adverse use necessary to establish a prescriptive right. Such acts are merely occasional torts, perhaps not at once resisted only because they were deemed unimportant and did but a trifling injury to the plaintiff."

The acts of user relied upon by respondent consist at most of desultory acts of trespass, of short duration and occurring at widely separated intervals. And it is wholly immaterial whether the reservoir was drained once or twice a year, as the same conclusion would follow. The separate acts of draining the reservoir were wholly lacking in continuity, and were not sufficiently open and notorious so as to charge the appellant's

grantor or the appellant himself with presumptive notice of such occasional use.

The decree is reversed, and the cause remanded with direction to enter a decree perpetually enjoining the respondent from discharging the waste or refuse water from its reservoir into the gulch and onto and across the land of the appellant.

It is so ordered.

TOLMAN, C. J., PARKER, MAIN, BEALS, and HOLCOMB, JJ., concur.

MILLARD, J. (dissenting)—I adhere to the views expressed in the Departmental opinion. *Downie v. Renton,* 162 Wash. 181, 298 Pac. 454.

The majority opinion is erroneously predicated upon the assumption that the "wild lands" rule is applicable to the case at bar. Websterian definitions of the elements essential to the acquisition of title by adverse possession can not bring appellant's property within the "wild lands" rule.

What constitutes adverse possession in a populous country is one thing. It is quite another thing in a sparsely settled country. *Murray v. Bousquet,* 154 Wash. 42, 280 Pac. 935. Appellant's small tract (two acres) of unused and unimproved land, just south of the city of Renton and adjacent to a county road, is not located within a wild and very sparsely settled country. It is not so situated that it might be taken and held for years without any one knowing whether there was or was not a trespass. Renton's population is in excess of four thousand. Within fifteen miles of appellant's land is the city of Seattle, which has a population of 365,583. Approximately four hundred thousand people in this motor age live within a radius of fifteen miles from appellant's land.

There was an actual and notorious possession by respondent for the prescriptive period. The respondent's use, as its needs required, of the land for thirteen years was a possession of such character, in view of the populousness of the area in which the tract used was located, as to apprise the community in the vicinity of the land and the public in general of the use to which respondent was subjecting the land.

HERMAN and MITCHELL, JJ., concur with MILLARD, J.

