FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2013 APR 29 AM 10: 16

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| ROSS and KATHLEEN MCWAID, husband and wife, | ) ) ) | No. 69861-3-I |
| | ) | DIVISION ONE |
| Respondents, | ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| | ) | |
| VINCENT A. DHANENS and SUSAN J. DHANENS, husband and wife, and their marital community, | ) ) ) ) | |
| | ) | |
| Appellants. | ) | FILED: April 29, 2013 |

SCHINDLER, J. — Lakefront property owners Ross and Kathleen McWaid and Vincent and Susan Dhanens disputed the scope of a recorded easement. The trial court ruled that the McWaids are entitled to use the entire area described in the recorded easement, and the McWaids established a prescriptive easement over a small area that falls outside the recorded easement. We affirm.

FACTS

The findings are undisputed. John Friend was the president of Friend & Friend Enterprises Inc. Friend & Friend Enterprises owned undeveloped lakefront property in Thurston County. A paved county road, Mullen Road, is located to the north of the property and Lake St. Clair is located to the south.

In 1991, Friend obtained a boundary line adjustment to subdivide the property into a number of lots, including lakefront lots A, B, and F. In order to access the lakefront lots, Friend constructed a rough dirt roadway. The dirt roadway began at Mullen Road and went across lot B and lot A to the boundary of lot F. Lot F has a relatively flat building site near the middle of the lot that is separated from the lakefront by a steep hill.

Lawrence Kaufman told Friend he was interested in purchasing lot F but only if Friend provided vehicle access to the building site and to the lakefront. Friend then constructed a fork in the portion of the dirt roadway located on lot A. The upper fork allowed access to the building site and the lower fork allowed access to the lakefront on lot F.

Friend recorded a "Road Easement and Maintenance Agreement" (Road Easement). The Road Easement is dated July 18, 1991, and was recorded September 20, 1991. The Road Easement provides for a perpetual, nonexclusive easement to construct, maintain, and use the road to enter and leave the property. The Road Easement provides that the road "shall be maintained as to allow" its use by vehicles "in order that all parties may enjoy full and unrestricted use of the parcels of real property served by said access roadway."

Friend sold lot F to Kaufman on September 20, 1991. In 1992, Friend constructed an asphalt road approximately 16 feet wide within the area described in the Road Easement. Like the rough dirt road that it replaced, the asphalt road splits into two forks about 90 feet from the boundary of lot F. The upper fork of the asphalt road leads to the building site, and the lower fork of the asphalt road leads to the lakefront on

lot F. Friend also installed utility lines along the lower fork that terminate at a utility box located on lot F. Friend did not have the boundary of the Road Easement surveyed before constructing the asphalt road. Unbeknownst to Friend, a small triangular portion of the lower fork of the asphalt road lies outside the road easement area.

Throughout the time Kaufman owned lot F, he regularly used both forks of the roadway to access and use the property.

In October 1992, Friend sold lot A to Michael and Stacia Spridgen (Spridgen). After purchasing lot A, Spridgen almost immediately left for Germany and did not return until 1993. In 1995, Spridgen abandoned plans to build a house on lot A and moved to Washington, D.C. In October 1997, Friend sold lot B to Vincent and Susan Dhanens (Dhanens).

In September 2000, Kaufman sold lot F to Andrew Schell. Like Kaufman, Schell used both forks of the road to access and use the property. In June 2003, Spridgen sold lot A to Dhanens.

In June 2004, Schell sold lot F to Ross and Kathleen McWaid (McWaid). Shortly after purchasing lot F, McWaid began construction at the building site. During construction, McWaid and the contractors regularly used both the upper and lower fork of the road to access lot F.

In early December 2004, Vincent Dhanens told Ross McWaid that he did not have the right to use a portion of the lower fork of the asphalt road that was not a part of the Road Easement. McWaid obtained a survey to determine the location of the easement. The survey showed that a small triangular portion of the asphalt road was located on Dhanens' property. McWaid decided to widen the lower fork of the road

3

within the road easement area to obtain access to the lakefront without using the small triangular portion of the asphalt road located on lot A.

In April 2005, McWaid began to excavate dirt from the hillside lying between the upper and lower fork to widen the lower fork. Dhanens objected to excavating the hillside without a permit from the county. After obtaining a permit, McWaid resumed excavation. Dhanens consented to widening the road, constructing a retaining wall on his property, and agreed to contribute $330 to pay for part of the cost of the work. But in June 2010, Dhanens prevented McWaid from accessing the lakefront portion of the McWaid property by blocking the lower fork of the asphalt road.

On June 22, McWaid filed a lawsuit against Dhanens to reform the Road Easement to conform to the asphalt road that the developer originally constructed, or in the alternative, to quiet title to a prescriptive easement to the small triangle of asphalt road located on Dhanens' property. McWaid also filed a motion for a preliminary injunction to enjoin Dhanens from blocking the lower fork of the road.

The court granted McWaid's motion for a preliminary injunction and enjoined Dhanens "from blocking or interfering with the McWaids' use of and access over any portion of the area legally described in the 1992 Road Easement and Maintenance Agreement."

Dhanens filed an answer and a counterclaim for trespass against McWaid for using the lower fork of the asphalt road. Dhanens claimed that the lower fork was constructed to allow access to lot A. Dhanens asserted McWaid could not establish a prescriptive easement to any part of the lower fork roadway.

A number of witnesses testified during the three-day bench trial, including Ross McWaid; Vincent Dhanens; Michael Spridgen, the previous owner of lot A from October 1992 to June 2003; Kaufman, the previous owner of lot F from September 1991 to September 2000; and Schell, the previous owner of lot F from September 2000 to June 2004. The trial court also admitted into evidence a number of exhibits, including the Road Easement and Maintenance Agreement; the 2005 survey map; and aerial photographs of lot A and lot F taken in 1992, 1996, and 2003. The trial judge conducted a site visit to inspect the property and the disputed easement area.

The trial court ruled that McWaid is entitled to use the entire road easement area, including the new gravel roadway that he constructed, and that McWaid established a prescriptive easement for the portion of the asphalt road lying outside the easement on lot A. The court entered lengthy and detailed written findings of fact and conclusions of law.

The court concluded that the use by the previous owners of the small triangular portion of the lower fork of the asphalt road outside the recorded easement was open and notorious, continuous and uninterrupted, and hostile and adverse for a 10-year period beginning September 20, 1991, until September 20, 2001.[1] The court also ruled that the asphalt road within the recorded road easement area "did not fix the Road Easement Area or cause it to contract;" that "[t]he McWaids acted reasonably, and within the rights granted to them by the Road Easement, in relocating the travelling surface within the existing easement;" and were entitled to continue using and maintaining "the graveled surface area they created."

---

[1] Kaufman purchased lot F from Friend on September 20, 1991.

The trial court entered a judgment in favor of McWaid, dismissed Dhanens' counterclaim, and awarded McWaid attorney fees. The judgment states, in pertinent part:

> 5. The Court DECLARES that the McWaids are entitled to make reasonable use of the Road Easement Area for purposes of ingress, egress, and utilities. Further, the McWaids may utilize the entire Road Easement Area for the purpose of making full and unrestricted use of their property [lot F]. The McWaids may access the McWaid Property at different points from the Road Easement Area, including, but not limited to, access to both the upper portion of the property where the McWaids' home is presently located, and to the lower portion of the property extending toward [L]ake St. Clair, including in the manner in which the McWaids access historically has been and/or presently is configured. The McWaids are entitled to utilize the area legally described in the Road Easement and Maintenance Agreement for the purpose of travelling between these two areas of the McWaid property.
>
> 6. The Court further DECLARES that the McWaids possess a prescriptive easement over the following area located on the Spridgen Property [lot A]:
> [Description of prescriptive easement area.]
> (Hereinafter, the "Prescriptive Easement Area").
>
> 7. The Court further DECLARES the McWaids are entitled to use the Prescriptive Easement Area for the same purposes and in the same manner which the McWaids are entitled to utilize the Road Easement: for ingress, egress, and utilities, and for all the purposes which the Court described in paragraph 5 of this Judgment.
>
> 8. The Court PERMANENTLY ENJOINS the Dhanens, their agents, their successors in interest, and any other person with knowledge of the provisions of this Judgment from blocking or in any manner interfering with the McWaids' use of and access over any portion of the Road Easement Area and/or the Prescriptive Easement Area.

Dhanens appeals.

## ANALYSIS

Dhanens contends the trial court erred in concluding McWaid established a prescriptive easement for the portion of the asphalt road outside the recorded easement area.

To establish a prescriptive easement, a claimant must prove (1) use adverse to the title owner; (2) open, notorious, continuous, and uninterrupted use for 10 years; and (3) that the owner knew of the adverse use when he was able to enforce his rights. Lee v. Lozier, 88 Wn. App. 176, 181, 945 P.2d 214 (1997) (citing Bradley v. Am. Smelting & Refining Co., 104 Wn.2d 677, 693, 709 P.2d 782 (1985)). We review whether a party has established the elements of a prescriptive easement as a mixed question of fact and law. Petersen v. Port of Seattle, 94 Wn.2d 479, 485, 618 P.2d 67 (1980).

We review the trial court's factual findings for substantial evidence. Substantial evidence is the quantum of evidence sufficient to persuade a rational fair-minded person the premise is true. Sunnyside Valley Irrigation Dist. v. Dickie, 149 Wn.2d 873, 879, 73 P.3d 369 (2003). We must defer to the trier of fact for purposes of resolving conflicting testimony and evaluating the persuasiveness of the evidence and credibility of the witnesses. Burnside v. Simpson Paper Co., 123 Wn.2d 93, 108, 864 P.2d 937 (1994). Unchallenged findings are verities on appeal. Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 808, 828 P.2d 549 (1992). "[T]he court's conclusion that the facts, as found, constitute a prescriptive easement" is a question of law. Lee, 88 Wn. App. at 181.

Dhanens assigns error to only two of the findings of fact. Dhanens contends the court's finding that the previous owner of lot F "regularly accessed and used" lot F from September 2000 to June 2004 is not supported by the evidence. Finding of Fact 58 states, in pertinent part:

> Andrew Schell and his family . . . regularly accessed and used [lot F], and both forks of the road leading to [lot F], in exactly [the] manner one would expect an owner of undeveloped lakefront property to access and utilize

7

such property: to camp on it, to access the lake, and to enjoy the view from the property.

Dhanens relies on Downie v. City of Renton, 167 Wash. 374, 9 P.2d 372 (1932), to argue that Schell's testimony is insufficient to support a finding that his use was "regular" because he did not expressly testify to continuous use of the lower fork of the road to access lot F between September 2000 and September 2001. Downie does not support Dhanens' argument.

In Downie, the city surreptitiously drained contaminated water through a waste pipe and onto the landowner's property once or twice a year. The court described the landowner's property as an "unfenced, unused, and unimproved . . . wild stretch of acreage almost as nature left it." Downie, 167 Wash. at 380-81, 379. The court held that the city's surreptitious use of the property was not open, visible, or notorious, and the adverse use consisted of "separate" and "desultory" acts of trespass that were not continuous. Downie, 167 Wash. at 383-84. The court expressly pointed out that "it is wholly immaterial whether the reservoir was drained once or twice a year" because the "separate acts of draining the reservoir were wholly lacking in continuity." Downie, 167 Wash. at 383-84.

In contrast, here, Schell testified that whenever he went to the property, he used the lower fork of the road that ran across lot A.

> I mean, we showed up periodically, you know, whenever we
> actually trained dogs out in the area. So usually on the weekends
> we would stop by. And -- when we had time. And so we would just
> use whatever parts of the property, you know, we -- we wanted to.
> Because we owned it.
> So we would pull up past the neighbors' driveway, which I
> think is the defendant over here in this case. And we would pull up,
> park wherever we wanted on either road. We'd pull down the
> actual access road down to the lake, park at the bottom there, walk

down to the lake from there. Or we would park on the upper piece. We actually camped on the upper piece. . . .

Q. And how frequently would you be out on the property during the time that you owned it?

A. Honestly, I mean, I -- I'd be lying if I told you an exact number. I mean, we were out there periodically, you know? You know, I actually had to go back and look. We had this thing for, like, four years. So we went out there probably more than a dozen times. And we camped out there with our family probably -- I don't know -- several times.

The unchallenged findings also establish that Schell used the property "in exactly [the] manner one would expect an owner of undeveloped lakefront property to access and utilize such property."

As in Lee, substantial evidence showed that Schell used the access road and the property year-round for recreational purposes in the manner of a true owner. In Lee, the owner of a lot allowed a community dock to be built on his property. Lee, 88 Wn. App. at 179. In concluding the neighbors had a prescriptive easement to use the dock, the trial court rejected the argument that because the neighbors' use of the dock was "sporadic and seasonal, taking place mostly during the summer months and on the weekends," the use was not continuous or uninterrupted; and "continuous and uninterrupted use" does not require proof of "constant use." Lee, 88 Wn. App. at 185. The court held that " 'the claimant need only demonstrate use of the same character that a true owner might make of the property considering its nature and location.' " Lee, 88 Wn. App. at 185 (quoting Double L Props., Inc. v. Crandall, 51 Wn. App. 149, 158, 751 P.2d 1208 (1988)).

Dhanens also contends substantial evidence does not support the trial court's finding that the previous owner of lot A from October 1992 to June 2003, Spridgen, knew of the adverse use of the lower fork of the asphalt road by the owner of lot F. The

9

trial court found that Spridgen knew of the adverse use because "[t]he road to the lower portion of Lot F extending directly off the end of the lower fork and clearly visible in the photographs from 1992, 1996, and 2003 are sufficient notice [to Spridgen]." As to the aerial photographs, the findings of fact state:

> 26.    The aerial photograph admitted as Exhibit 6 was taken on July 31, 1992, shortly after Friend had constructed the asphalt roadway. It shows both the paved forks of the easement road with the end of the pavement at the boundary at [lot F] clearly visible. It shows unpaved roads extending directly off the paved forks to both the [building site] and Lakefront areas of [lot F]. It shows a landing area on the Lakefront area of [lot F], as described by Lawrence Kaufman.
>
> 27.    The aerial photograph labeled "1996 Geodata Aerial Photograph" admitted as part of Exhibit 28 also clearly shows a defined road extending from the end of the paved lower fork into the Lakeside area of [lot F].

Dhanens points to Spridgen's testimony that when he visited the property in October 1992, "there were blackberry bushes and stuff out there growing in that area [of the dirt road];" and that when the 1996 photograph was taken, Spridgen was living in Washington, D.C., to argue insufficient evidence supports the court's findings. But Dhanens does not challenge the finding that the court found Spridgen's testimony was not credible. As previously noted, we defer to the trial court's determination regarding witness credibility and persuasiveness of the evidence. Burnside, 123 Wn.2d at 108.

Next, Dhanens contends the trial court erred in concluding McWaid was entitled to alter the existing asphalt road under the terms of the Road Easement. The conclusions of law state, in pertinent part:

> 22.    The 1991 Road Easement and Maintenance Agreement specifically describes the area which is to be subject to the easement (the "Road Easement Area.").
>
> 23.    The fact that Friend initially constructed the roadway at one location within the Road Easement Area did not fix the Road Easement Area or cause it to contract. The McWaids are entitled to make reasonable use of the entire Road Easement Area.

24. In 2004/2005, the McWaids learned from the Dhanens, and then verified by survey, that a small triangular portion of the asphalt roadway surface lay outside the Road Easement Area. The McWaids further learned that the Dhanens objected to the McWaid[s'] use of any portion of the asphalt roadway surface outside of the Road Easement Area.

25. In response, the McWaids decided to construct a travelling surface for accessing the Lakefront that would lie entirely within the Road Easement Area.

26. The McWaids acted reasonably, and within the rights granted to them by the Road Easement, in relocating the travelling surface within the existing easement.

27. The McWaids are entitled to continue to use and maintain the graveled surface area they created in 2005 to access the Lakefront portion of the McWaid Property.

In determining the scope of an easement, we look to the language of the original grant to determine the permitted uses. Brown v. Voss, 105 Wn.2d 366, 371, 715 P.2d 514 (1986).

The Road Easement provides, in pertinent part:

> WHEREAS, [Friend] hereto desire[s] to construct a permanent common access road for their properties to Friendly Lane, and desire that a formal easement be established; and
>
> WHEREAS, [Friend] hereto further desire[s], on behalf of themselves and their heirs, successors and assigns, to contract for the perpetual maintenance of said roadway;
>
> NOW THEREFORE, in consideration of the terms, conditions, covenants and performance contained herein, [Friend] hereto agree[s] as follows:
>
> 1. EASEMENT GRANTED. Friend . . . as Grantors, do hereby grant and convey to its successors and assigns, as Grantees, a perpetual, non-exclusive, easement for the construction, maintenance, use and operation of a road for ingress, egress, and utility purposes, to serve the property described hereinabove . . . .
>
> . . . .
>
> 2. INITIAL CONSTRUCTION. The initial construction of said easement road shall be performed by or under the supervision of FRIENDS' expense. Said road shall be constructed according to Thurston County standard road specifications for private gravel access roads. FRIEND shall obtain and comply with all necessary government permits for the construction of said road and FRIEND shall be responsible for the clean-up of any construction debris.

11

3.    BASIC MAINTENANCE TERMS.    The parties hereto agree that the roadway described hereinabove shall be maintained in perpetuity within the described easement boundary or such boundaries as may be agreed to hereinafter by all parties.  The surface of the roadway shall be maintained so as to allow free and reasonable passage of such vehicular traffic as may be reasonable and necessary in order that all parties may enjoy full and unrestricted use of the parcels of real property described hereinabove.

. . . .

7.    BENEFIT OF COVENANT.    The rights and obligations set forth herein shall inure to [and] be binding upon the heirs, successors or assigns of the parties hereto and shall constitute a covenant running with the parcels of real estate affected hereby.

Dhanens argues that the Road Easement authorizes only a single permanent road that the grantees must maintain but may not expand or otherwise alter. Accordingly, Dhanens contends McWaid violated the Road Easement by unilaterally constructing a second road.

Dhanens' argument ignores the express language of the Road Easement granting an easement "for the construction, maintenance, use and operation of a road for ingress, egress, and utility purposes, to serve the property described hereinabove." The Road Easement also states that the road shall be maintained "so as to allow free and reasonable passage of such vehicular traffic as may be reasonable and <u>necessary in order that all parties may enjoy full and unrestricted use of the parcels</u> of real property described hereinabove."[2] As McWaid points out, constructing a road surface in one portion of an easement area does not cause the easement area to contract. See, e.g., 810 Props. v. Jump, 141 Wn. App. 688, 699, 170 P.3d 1209 (2007) (the dimensions of an easement do not contract merely because the holder fails to use the entire easement area).

_____

[2] (Emphasis added.)

12

Further, the unchallenged findings establish that (1) the previous owners paid a price for lot F "consistent only with a lot" that affords "meaningful waterfront access;" (2) McWaid "create[d] an additional flat surface located within the road easement area on which they could travel to and access the Lakefront" areas on their property by using the "travelling surface" together with "that portion of the lower fork of the asphalt roadway lying within the Road Easement Area;" and (3) after Dhanens prevented McWaid from excavating the hillside, Dhanens "consented to the McWaids['] completion of the work, and to the McWaids['] subsequent use of the traveling surface created thereby."

We affirm.[3]

WE CONCUR:

---

[3] We decline to award McWaid attorney fees on appeal under RAP 18.9(a).

13